316-0219, the Myers Group, Inc. v. Donna Meredith, and will be by Penn State College. Please proceed. May it please the Court, Counsel. My name is Brian Spang. I represent the appellant, the Myers Group. The trial court required the Myers Group to prove that it had near-permanent relationships with its customers in order to establish legitimate business interests and enforce the client restrictions here. Just a few years before, in reliable firing, the Illinois Supreme Court ruled that the near-permanent relationship requirement was, quote, no longer valid. The trial court therefore applied an incorrect legal standard in the case. What standard did the trial court apply? The trial court applied a requirement that client relationships be unique or special, a standard that had been applied by the appellate court for a while, but which reliable fire expressly stated is no longer valid and was the incorrect standard. Reliable fire refers to prior Illinois Supreme Court precedents, House Division and Cockrell in particular, which hold that a client relationship by itself, a relationship that the salesperson who makes contacts during their employment is able to use competitively, unfairly competitively when they leave, and use those contacts developed while working for the employer to take clients away to a competitor. The protection of those relationships by itself is a legitimate business interest that can support and not compete or non-solicit. That was the case law, that's the holdings of House Division and Cockrell, and that's the explanation in reliable fire. In fact, that was the statement, as I pointed out in my brief, in this court's prior decision in Tyler Enterprises, where it states that the interest the employer has is in preventing an employee from taking over its customers through the contacts he or she has made with those customers. The trial court here, multiple times as I pointed out in my brief, required near-permanent or some higher standard, some different standard. In particular, the trial court was concerned that the clients weren't exclusive and that there had to be long-standing near-permanent relationships, and that just isn't the standard. It wasn't the standard before, and it certainly isn't the standard for reliable fire. Can I ask a question about the – I want to ask a question about the motion to reopen proofs, because it wasn't – the statement, I guess, is that we would provide more concrete clarity to issue damages. It doesn't appear that there was ever an offer approved for which you wanted – why you wanted to open the proofs up. I mean, what was it going to be? There was never an offer approved of what – you know, there was a necessity to open the proofs, because that doesn't say anything. It provides more concrete clarity to an issue. What does that mean? Typically, when you make a proffer to put some more evidence on, the good practice is to say if the judge denies it, make an offer approved by either a statement or a witness. You know, it doesn't have to be law, but it has to be something. So with this, it's something in this offer to open the proofs. Your Honor is right. The statement by counsel was that we were going to provide specific damages evidence. It's the lack of specific damages evidence that the court – the trial court relied on in part to grant directed finding. So that information is obviously important. It was going to be or planned to be evidence about – to tie together more clearly the clients, the placements that were made by Defendant Meredith while she worked for the Myers Group. That hadn't gone in as clearly as counsel had – trial counsel had intended. Revenues, historical revenues, and then also more clearly tying together the fact that this same group, a group of clients in Defendant Meredith's first 12 months on her own competing, there's a group of clients, five or six, to which she made placements. But, you know, that seems to go a lot further than 10 minutes, because the only thing we have in the record is a request to open the proofs up. It's not going to take more than – I'm paraphrasing. It's not going to take more than 10 minutes, and it's just going to give clarity to some damages. I think the issue – one of the issues of which didn't come out clearly was in order to trigger the restriction, there has to be an actual placement or solicitation of a job order. So we're not talking about hundreds of clients here. We're talking about a handful. And it wouldn't take that long to present evidence that, yes, there were actually concrete job orders, the historical payments of those clients. And one of the exhibits that was reviewed but not entered into evidence was a placement report of Defendant Meredith showing, listing, all her placements. I think there were 12 of them that were shown in her first 12 months, the period of non-solicitor. That list also includes the payments. So that's just one exhibit. And putting together just quick proof that they were, in fact, the job orders were, in fact, made, some additional information on profit margin, and then proving that those clients, that handful of clients moved from the Myers Group to Defendant Meredith can be done in 10 minutes or so. And that would have solved – None of that was told to them. You know, because this is a huge discretion standard, and normally somebody gives something to the project to be able to work with. I understand, Your Honor. At the same time, because the representation was made, it wasn't as clear as it could have been. I agree with that. To say, though, that it was going to be a relatively short presentation goes to the point in the Dunahee case that we cite on the standard to reopen proofs. Could you speak up a little? Sorry. That is not an amplification, by the way. That's only for recording purposes. Okay. Okay? Thank you. Thank you. The situation here is a lot like the Dunahee case in that, given the circumstances, the trial had not taken a long time. There was only one day of trial up to that point. This second day had been scheduled for an entire day. We were just at the beginning of the second day. Judgment had not been rendered, and the motion for directive finding had not been made. So could the presentation have been more clear? Sure. Was it fair, though, to just shut it down and say, I'm not going to allow you to present – I'm not going to let you do that, even though I've got all day. It's not going to take very long. All the witnesses are here. And then make a ruling as part of the directive finding that you didn't present enough damages evidence. That, I think, lines up with the Dunahee situation. I think that does show abuse of discretion, because the other standards as well are meant – that goes to the no-quotient reason to deny. It was a bench trial as well, so trial judges should be of greater liberty to reopen proof in that situation. The other items of the motion to reopen are also all present. There's no prejudice. We all know what this information is. It's damages evidence. It was the subject of the motion for directive finding, so obviously defense expected to hear it. And it was of the utmost importance, because as we said, the trial court granted directive finding in part on the lack of damages evidence. The client solicitation restriction was enforceable, and the trial court erred in finding it wasn't enforceable. And I want to make three points to this. First, legitimate business interests, which we talked about. Second, the reasonableness of the restriction. And third, I want to address the severability argument raised by defendants in their appellate brief. I think we covered a customer relationship issue. There was evidence of customer relationships, evidence of long-term customer relationships. The testimony was this is a relationships business. That the clients and customers of the Myers Group are repeat customers, and they come back because salespeople, like defendant Meredith, develop relationships. I don't want to waste my time on that first point. Your argument seems as if you take literally the Supreme Court as contacting customers, period, right? I'm sorry. Move on to the second or third point. We'll do it. The first point you covered earlier. Thank you. Under the Supreme Court authority. The reasonableness of the restriction is also at issue. It's a two-part definition. The first part defines client to mean an employer who has given the Myers Group a job order or for which the Myers Group has solicited a job order. So there's actual contact with the client. The second limitation is a limitation specific to defendant Meredith that the employee shall not solicit any client who the employee actually has contact with or knowledge of or access to. So there's two reasonable limitations, you know, based on the precedence of the appellate court. It's customers that the Myers Group has actually dealt with and customers that the defendant Meredith actually dealt with or had access to. That's reasonable under the precedence that we set in our brief. The only argument on this point made by defendant is that somehow this restriction allows or bars competition for prospective customers. That's not the case here. Again, because it's limited to actual customers the Myers Group had contact with, it's limited to actual customers that the defendant Meredith had contact with or access to. So the two cases cited, Assured Partners and Lawrence & Allen, for the proposition that a restriction can't bar you from potential customers no one's ever contacted just are inapplicable here. So the restriction itself is reasonable. The record evidence shows it was violated at least as to one client in the record, Western Extrusions, which was a client Ms. Meredith admitted she made a placement for on behalf of the Myers Group and admitted she made a placement for on behalf of her competing business. The severability agreement is raised on the theory that if the true non-compete or the non-disclosure clause are overbroad and unenforceable, that the client non-solicit should also be voided. The focus of that legal rule is on essential. The invalid term has to be essential to the contract in order to void an entire contract. And there's an important distinction between essential and important. If a term is important, then that client non-solicit is an important term in this contract. So was the non-compete, so was the non-disclosure, but just because one of those is invalid doesn't mean the entire contract is invalid. An essential term is a term without which the contract cannot survive. So the case cited by the defendant, the Kepler & Company case, was a case providing services for a fee. The fee structure was held invalid by statute. Without that, and the appellate court said that was the essence of the contract, the fee-sharing provision, that was invalid. Without that provision, there is no contract. It's different here in this context because it was a multi-part contract. Another thing, another point the Kepler & Company decision makes is that cases multi-part, complex multi-part agreements should not be voided just because one particular part is void. This is an employment agreement with at least 23 parts and most of those have sub-parts. This is the multi-part contract the Kepler & Company decision is talking about. And also, Kepler & Company relies on the restatement of contracts, section 184, comment A. That comment, as we point out in our brief, specifically calls out employment agreements and non-competes in employment agreements as an example of the type of important but not essential provision that even if it's void, does not void the entire contract. Restatement second, yes, of contracts. To sum up here, the trial court applied an incorrect legal standard. The trial court prohibited the Myers group from presenting additional damages evidence and then turned around and entered a directive filing in part because of the lack of evidence. That's just not a fair trial. The Myers group, like all plaintiffs, is entitled to a fair trial applying the proper legal standard to all the relevant evidence. So I request that this case, the decision, the judgment be reversed and the case be remanded for a new trial. Thank you. Thank you, counsel. May it please the court, counsel. This court should affirm the decision of the circuit court for two reasons. First, the court properly exercised its discretion in denying the motion to reopen proofs and the court properly entered a directive finding at the close of the Myers group's case on the breach of contract claim. We've cited our points and authorities in our brief, and today I want to address those two arguments in the context of the questions that counsel was asked and the points that he raised. The first question that was asked, Justice Holdredge, you asked, what legal standard did the court apply? Now, if you read the ruling of the court, she applied exactly the right standard. This case, in large part, does hinge on the reliable fire case. That's a 2011 Supreme Court case that reaffirmed the longstanding rule of reason that courts apply to restrictive covenants. What reliable fire did is it expressly stated that when considering instructive, rather, trial courts, when considering a legitimate business interest, that an employer must prove that the court needs to consider the totality of the circumstances. And I would direct the court to paragraphs 42 and 43 of that opinion, which is really the essence of that case. And it specifically says that when assessing the reasonableness of the covenant, the court must look to near permanent customer relationships, an employee's acquisition of confidential information, and then the specific covenants themselves that are at issue in terms of the time and scope restrictions. Well, along those lines, is it really irrelevant why the plaintiff had this restrictive covenant in the employment contract? Is it relevant that they were in, why they had them in the contract? Wouldn't that go to all those things you just talked about? Sure. I mean, you would think that the plaintiff would need to show in its offer of evidence to the court what the interest was and to clearly articulate that interest. And then ‑‑ Well, I get that. But so that's why I'm baffled as to why the judge sustained a relevance objection when the plaintiff tried to ask their witness about why do you have these. And I think in the particular questions that were asked, I think counsel then could have phrased his questions more clearly and did not. So I don't recall the specific ones offhand. I know what you're referring to generally. But it looks like he gave up on following up on those objections and then rephrasing the questions. Some of those were very broad without time indications of when, for instance, the company would have acquired particular customers. I think the vagueness of those questions was concerning, but there was no follow-up. And I think it's counsel's obligation at that point to pivot and to ask a different question that gets to the same subject matter. Also note that the specific evidentiary rulings have not been appealed by the plaintiff in this case. Well, I guess it goes to this first issue of the judge's exercise of discretion in refusing to reopen the proofs in the morning of day two. When, as I read the record, at the end of day one, the judge was kind of, you know, come on, you've got five minutes, ten minutes, let's go. We've got to close this courthouse down. And are you done? And then comes back in the next morning and says, I'd like to reopen the proofs, denied. I mean, is that really the way we want to try cases? Well, and I think in fairness, though, you need to look a little bit before the end of that day where there was some discussion about what day is counsel available. She clearly was not upset about having to give them more time. Trials go on. I mean, they take longer than counsel expects. And so there was a, you know, at one point I think counsel apologized. She said don't apologize. I mean, if it did get to the end of the day and people needed to close up the courthouse, I think that's a fair comment to make without reflecting any animosity towards the parties. I'd also suggest, too, that if you look at the last ten, 15 questions that counsel asked of Ms. Meredith when she was on adverse examination, they were totally irrelevant to the case. There was discussion about whether she pulled money out of her retirement account. It had nothing to do with any issue in the case. If there was some frustration creeping in at the end of a long day, that's understandable. That's human nature. And, you know, in terms of the reopening proofs that you asked, I think that, you know, the judge is entitled to know what it is, entitled to demand some specificity as to the evidence. And there was no offer of proof. There was no articulation of what the business records were. There was no explanation beyond the most high-level description that it had to do something with regard to damages. There was no written motion on file. There was a significant period of time that lapsed. You know, there's the point made in the briefs that the Myers Group filed that, you know, we don't require an offer of proof. It's a bench trial. And there's no case law that suggests an offer of proof is required. And then they rely on the Dunahee case from the 4th District, both on its facts and for the legal standard. And in the Dunahee case, the proponent made an offer of proof. And then, you know, in fact, in the case that's not cited, neither of the briefs that just came out from the 1st District a few weeks ago called In Re Parentage of I.I. on December 23rd, same issue. A motion to reopen proofs was filed. The appellate court looked at the trial judge's decision to deny that motion to reopen proofs and specifically commented on the fact that the proponent never made an offer of proof at all. And in this case, you know, I think if the trial judge is being asked to exercise her discretion, she's entitled to know specifically what it is. And in going back to Dunahee to distinguish that case, because they heavily rely upon that, the particular proof that was offered and that the trial judge did not consider was a very technical piece of evidence as to damages. And the plaintiff had actually offered specific evidence of damages, but because of the way the statute was worded, they got the particular day wrong on how to calculate damages under a wage garnishment proceeding. And they made a mistake. Yeah, they made a mistake, but they exercised good faith in trying to get the specific evidence of damages in. Here what we have is a really what amounted to an incoherent theory of damages through the entire first day of trial from the only two witnesses in the case. And as you can see from the briefs, that theory of damages has evolved from the first day of trial onto the motion for directed finding, the motion to reconsider, and even the appellate court. There's no coherent theory. There's never been a coherent theory. So if the trial judge is looking at a broad statement about, you know, we need to clarify some damages here, ten minutes is not sufficient. Ten minutes would not have allowed the Myers group to present historical sales evidence. The very types of information you think that a plaintiff would be prepared to present through their own witness or through an adverse witness, no effort whatsoever. The trial judge simply did not know what the Myers group intended to do. Getting back to the original question that you asked about the proper legal standard, the plaintiff makes the argument that Judge Albrecht applied an improper legal standard requires some unique relationships with customers. Reliable Finer talks about the necessity of showing a legitimate business interest under the totality of the circumstances, including the specific terms of the restrictive covenant. When Judge Albrecht gave her ruling, she walked through the following factors. The customer relationships, the contingent nature of these agreements that were at stake, the undue hardship on Ms. Meredith if the covenants were to be enforced, the time and place restrictions under the contract, the fact that they were in certain places irrational and had no connection to the business interest at all. Even if she didn't invoke the name Reliable Finer, she addressed every single concern that Reliable Finer outlined and that how the court should frame its analysis of a restrictive covenant. She looked at the evidence presented. She weighed the quality of those customer relationships that the Myers Group testified to and that Ms. Meredith testified to. So we believe she applied the exact legal standard. Now, I will give you this. If this case had hinged on something other than customer relationships, for instance, if Ms. Meredith had downloaded a lot of documents out of a database and took those documents with her and the interest to be protected was confidential information and that was clearly the presentation of evidence at trial and the judge didn't focus on that or didn't address it, we might have a different issue. But here it's clear, and it's clear from their appellate brief. The interest to be protected was customer relationships. And Judge Albrecht addressed that interest specifically in her ruling and in the context of the terms of the restrictive covenant. The other thing to keep in mind when you read their argument about the legitimate business interest at stake here, it's not just enough to say, well, you have customer relationships. Every business has customers. Reliable Finer instructs specifically that you need to examine those relationships in conjunction with the terms of the non-compete. And the non-compete cannot be any greater than is required for the protection of that legitimate business interest. So a lot of times in the case law, when you see covenants enforced, they go up on appeal, there's a preliminary injunction affirmed, the court discusses the quality of the client relationships, historical sales, how deep these relationships were invested in by the employer in terms of marketing expenses, advertising expenses, what percentage of sales the business derived from its top-tier customers and how it's got a very deep interest in having those continue. We don't have any of that here. We don't have any historical sales data. We don't have any evidence at all as to what Ms. Meredith sold to any of these group of clients that were specifically discussed. In order to make it simple, you're saying in the state of Illinois, the state of the law, decisional law, even with reliable, is that an employer cannot, in a restrictive agreement covenant, restrict contact by a former employer with the customer base of the former employer, period. No, I'm not saying that. What I'm saying is that an employer may have a legitimate business interest, given all the facts and circumstances, in restricting an employee from soliciting or servicing accounts, but it depends on those facts and circumstances, the nature of the business that's at issue in the case. Right. So, in other words, an employer cannot prevent a former employee from contacting or conducting business with clients of that former employer. You've got to have a lot more than that, right? A lot more than just say you're in violation if you pick up the phone and call a client of your former employer. I might have misunderstood the question. I'm sorry. But I do think they need to show more. They need to show why. What's the interest to be protected? What could be the damage from that employee's contact? It's self-evident to most ordinary people. You're trying to take my client from my business relationship I've developed with you and steal it. Well, I would say that it's not, first of all, it's not stealing. You're taking it away from your former employer. That's the way the ordinary man would call it. The ordinary man may call it that, but if the relationships are fleeting and they're at a surface level, like they were in this case, or at least there was no evidence they were anything but, then the employer has no investment in those clients. It has no ongoing, continuing relationship with those clients. And that's why you see in these cases where the covenants are enforced, you see the proofs that establish the nature of that relationship, the continual pattern of sales and development. Think of a law firm or an accounting firm who have a stable base of clients over a long period of time. That reflects the goodwill of the business. We don't have any idea here. We don't have any idea what Western Exclusions did with the Myers Group over the past five years. We don't have any idea what kind of placements Ms. Meredith made with some of these customers that were identified. So in the main, I agree with you. And it's an easy point to articulate that a business has interest in its customers, but reliable fire specifically instructs that we need to go beyond that. And when we go beyond that, we go into the proofs as to the quality of those relationships and what they entail and what they mean for the business. Counselor, you have two minutes. With regard to the client solicitation restriction, which was one of the last points that counsel addressed, we do believe that in assessing the reasonableness, reliable fire instructs that you consider not only the terms, by looking at the contract, but also the legitimate business interest the Myers Group is trying to protect. With regards to the scope of that non-solicitation covenant itself, it does go beyond clients that Ms. Meredith may have had contact with. It goes beyond anyone she may have solicited. So if there was a customer that she placed a cold call to and didn't conduct any business at all, that would be restricted by the terms of the agreement. We think that clearly goes severable. I don't believe it's severable. Pardon? I don't believe under this Court's authority it is severable. The reason I say that is because of the Keppel case from the 3rd District. We've outlined that case in our brief. There was actually another case that was a Rule 23 order from this Court earlier this year where the Court applied Keppel to a non-compete dispute involving an employee. I think the problem, Your Honor, is that the non-compete, non-solicit terms go right to the essence of this contract. Why have it? Why make Ms. Meredith sign it several years after she had been employed there? The unrebutted testimony is that they told her she needed to sign it. They didn't want to give her time for a legal review. It wasn't really negotiable. She eventually signs it. But I think it is... Well, the law is pretty clear that's okay, right? That's okay. Because the employer has the other option. You don't want to sign it, you're fired as an employee of will. So instead of doing that, you can just say, hey, if you want to keep your job, sign on the dotted line. And I don't disagree. That's fine. The problem is that the argument is that it's not essential to the terms of the agreement, that the relationship wouldn't fall apart if she didn't sign it. And I think that the non-compete and non-solicitation are essential terms of this agreement. And I understand what the restatement says. But I think this Court's decision in Keppel trumps the restatement. So for the reasons that we've otherwise expressed in the briefs, if there are no further questions, we ask that the Court affirm. Thank you, Counselor. Counselor, you may proceed. Can you address that you have no consistent theory of damages that has evolved up to this point? I can address that by saying that damages evidence, as I outlined earlier, was going to be presented. That it was the inconsistent presentation in the first day, and this is what the record reflects, was realized and appreciated before the second day. And an effort was made to fix that. And that effort was denied and rejected. Does that answer it? Okay. Did you try this case? I did not. Okay. But I would have made the same statement even if I did. I just have a couple of points on what reliable fire actually says at paragraph 34. The restraint is usually, and that's italicized, justified on the ground that the employer has a legitimate business interest in restraining an employee from appropriating the employer's customer relationships, from stealing the customer's relationships. No more than that. Now, you do look at the totality of circumstances. So Jimmy Dons can't enforce a non-compete based on that clientele and those customer contacts. But a business like this, where the record evidence shows repeat business, that this is a relationships business, that's exactly the interest to be protected. Jimmy Dons does repeat business. They do have repeat business. That is a good point. I want to speak. The Rule 23 Order Council mentioned, I know the decision he's talking about. I think if you read that decision, it does cite Keppel. But I think the issue the court is addressing there is one of modification. We don't care. Okay. We have not modified that. I don't care either of that. You've got Keppel up there. That's the only one that's citable. Okay. To say follow Keppel but not the restatement doesn't make sense because Keppel is embracing the restatement section, that issue. So I think the restatement is important and is telling when the restatement specifically states in the employment context one void non-compete restriction does not void the entire agreement. Okay. The trial court's decision did not even reference the client solicitation restriction. So to say the trial court addressed other issues relevant to non-competes, undue hardship, for example, the trial court was only discussing the true non-compete, not the non-solicit. In fact, trial counsel brought that up. If you read the transcript, you'll see the trial counsel reminded the trial court there is a client non-solicit here, but it was never addressed by the trial court. So to say the trial court applied the proper standard only goes to her comments about the non-compete because she never said anything about the non-solicit or its reasonableness. The evidence trial counsel argues, and counsel did this in briefs too, the defendant did it in briefs, the evidence that defendant's claim was not there is exactly the damages evidence that Your Honor asked me about that I told you would have been provided. So it's circular to say you didn't present evidence and then try to defend the defendant's claim. You didn't present a decision on the motion for open proofs where that was the exact evidence that would have been put in. Counsel made the statement in his argument that trials go on. They take longer than you expect almost all the time. That was the situation here. And when trial counsel realized his errors and wanted to put in better damages evidence with a more cohesive theory, the trial court denied that request and then ruled in large part in the directive finding because of the lack of that evidence. That is not the way that we want cases to be tried, to go to your earlier question. We want cases to be tried on all the relevant evidence when we have time to do so, which we did here. And we want cases to be tried on the proper legal theory. Myers Group respectfully requests that this judgment be reversed and this case be remanded for a full trial with the proper legal theory on all the relevant evidence. Thank you. Thank you, Counsel. Before we take this matter under advisement and render a decision, I will now take a recess for panel change.